UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────┐
BOARD OF MANAGERS OF THE 866 THIRD
AVENUE CONDOMINIUM,

              Plaintiff,

      -v-

THE CINCINNATI INSURANCE COMPANY and
CINCINNATI FINANCIAL CORPORATION,

              Defendants.
└─────────────────────────────────────────┘
```

25-cv-7810 (JSR)

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.:

On May 12, 2026, the Court issued a "bottom-line" Order granting in part and denying in part the motion of defendants The Cincinnati Insurance Company ("Cincinnati") and Cincinnati Financial Corporation for summary judgment against plaintiff Board of Managers of the 866 Third Avenue Condominium (the "Condominium"). ECF No. 12. This Opinion and Order sets forth the reasons for the Court's bottom-line Order and resolves the sole remaining issue presented by defendants' motion, which concerns the quantum of damages that Cincinnati owes with respect to the Condominium's claim for breach of contract.

I.    Factual Background and Procedural History

The parties broadly agree on the facts that have given rise to this insurance coverage action. See ECF No. 9-1 ("Defs.' 56.1 Statement"); ECF No. 10-2 ("Pl.'s 56.1 Statement"). In the early morning hours of December 23, 2024, a substantial water leak occurred in the condominium building that is managed by the Condominium and located at 866 Third Avenue in Manhattan. Defs.' 56.1 Statement ¶¶ 5-

1

10, 17; Pl.'s 56.1 Statement ¶¶ 17, 28. Water began flowing out of a common area on the twelfth floor of the building and cascaded down the building's stairwells, causing flooding in and damage to common areas and condominium units alike. Defs.' 56.1 Statement ¶¶ 18; Pl.'s 56.1 Statement ¶¶ 29-30.[1] As relevant here, the condominium units damaged by the flooding were owned by DiamondRock Realty, which operates a Marriott-branded hotel; SKI Realty, which holds title to a unit used as an outpatient care facility by Memorial Sloan Kettering; and 866 Third Retail, which operates retail space. Defs.' 56.1 Statement ¶¶ 6-9. The flooding damaged the building's elevators, fire alarm system, and related structures. Pl.'s 56.1 Statement ¶ 30. The Condominium promptly began to repair and remediate the situation. Pl.'s 56.1 Statement ¶¶ 31-32.

On either December 23, 2024, or December 24, 2024, the Condominium filed with Cincinnati a claim for coverage under a "Commercial Output" insurance policy that Cincinnati had issued to the Condominium. Defs.' 56.1 Statement ¶¶ 1, 17; Pl.'s 56.1 Statement ¶¶ 33. That policy, which was effective for the period running from December 13, 2024, through December 13, 2025, provided "coverage for direct physical loss or damage to covered property" at the condominium building, subject to the express limitation that "Cincinnati will not pay more than the

---

[1] The parties disagree on the precise source of the leak that caused the flooding, but that disagreement is immaterial to the Court's resolution of the instant motion. See Defs.' 56.1 Statement ¶ 18; Pl.'s 56.1 Statement ¶¶ 17-18.

2

insured's insurable interest in the covered property." Defs.' 56.1 Statement ¶¶ 2-4.[2]

Upon receiving the Condominium's claim, Cincinnati retained the firm of Young & Associates to conduct an investigation. Id. ¶ 19. Young & Associates prepared a report identifying damage at the condominium building and calculating the estimated cost of repairing what the report deemed to be the portions of the damage that were covered by the policy that Cincinnati had issued. Id. ¶¶ 21-22; Pl.'s 56.1 Statement ¶¶ 21-22. Based in large part on Young & Associates' report, Cincinnati issued payments to the Condominium in a total amount exceeding $320,000. See Defs.' 56.1 Statement ¶ 23 (asserting Cincinnati issued net payments totaling $362,681.19); Pl.'s 56.1 Statement ¶ 23 (asserting Cincinnati issued net payments totaling only $324,778.98). Cincinnati refused to issue payments in respect of certain additional invoices submitted by the Condominium, all of which concerned repair work that took place within the interior spaces occupied by the outpatient care facility and hotel. Defs.' 56.1 Statement ¶¶ 24-26; Pl.'s 56.1 Statement ¶¶ 24-26. Cincinnati refused to issue those payments because, in its view, the invoices "related to property located within individual units for which the [Condominium] bears no repair or maintenance responsibility under the condominium

---

[2] Except where otherwise indicated, all quotations in this Opinion and Order omit citations, internal quotation marks, footnotes, brackets, ellipses, and other such non-substantive alterations in source material.

3

governing documents." Defs.' 56.1 Statement ¶ 27; Pl.'s 56.1 Statement ¶ 27.

The affairs of the Condominium are governed by, among other documents, an Amended and Restated Declaration of Condominium (the "Declaration"), and the By-Laws. See ECF No. 9-4;[3] Defs.' 56.1 Statement ¶¶ 11-16; Pl.'s 56.1 Statement ¶¶ 11-16, 36-39. As relevant here, the Declaration provides that "damage to or destruction of the Building (other than any Owner's Installations or personal property) whether by casualty to or by condemnation of all or any portion thereof, shall be promptly repaired and reconstructed by the [Condominium] (or, if such damage or destruction shall relate to only one Unit and/or the Limited Common Elements appurtenant to such Unit, then by the applicable Owner)." Declaration § 24.1(A). The Declaration further provides that each unit owner "shall at its own expense maintain and take good care of its Unit . . . and shall make all repairs therein and thereto," subject to certain express exceptions, including "repair of damage due to fire or other casualty which is the obligation of the Board of Managers pursuant to Article 24 of this Declaration." Id. § 18.1(B). Moreover, the Declaration makes it the Condominium's duty to "be responsible for all aspects of Operation of the Property that are not the responsibility of the Owners," including, but not limited to, furnishing certain utilities and maintaining fire

---

[3] The document filed at ECF No. 9-4 includes both the Declaration and the By-Laws, among other materials. For the convenience of the reader, this Opinion and Order cites directly to relevant provisions of the Declaration and By-Laws.

alarm equipment. See id. § 10. As an exemption to its general rule that the Condominium is responsible for the building's "General Common Elements," the Declaration provides that "the costs incurred by the [Condominium] in maintaining and repairing the Common Freight Elevator" are expressly allocated to the owner of the "Hotel Unit." Id. § 7.2. Finally, the By-Laws empower the Condominium "[t]o cause repairs to be performed in a Unit in the event of an emergency (i.e., a situation involving continuing or imminent loss or threat of loss of life or property, personal injury[,] or material business interruption)." By-Laws, Art. III, § 6(a)(5).

On August 13, 2025, the Condominium sued Cincinnati and Cincinnati Financial Corporation in New York state court, bringing claims for breach of contract (Count One), breach of the implied covenant of good faith and fair dealing (Count Two), and declaratory judgment (Count Three). See ECF No. 1-2. The Condominium effected service of the summons and complaint on August 20, 2025. ECF No. 1-3. On September 19, 2025, defendants timely removed this action to federal court. ECF No. 1. Following discovery, defendants moved for summary judgment on March 11, 2026, and that motion was fully briefed on April 1, 2026. See ECF Nos. 9 (moving papers), 10 (opposition papers), 11 (reply papers). The Court held oral argument on May 8, 2026, and, as noted above, issued its bottom-line Order on May 12, 2026. See ECF No. 12.

Because that bottom-line Order concluded that neither party was entitled to summary judgment as to the quantum of damages that Cincinnati owes with respect to the Condominium's claim for breach of

contract, the Court directed the parties to meet and confer on damages. See id. at 2 (citing ECF No. 9-1 ¶ 23, ECF No. 10-2 ¶ 23). On June 2, 2026, the parties informed the Court that they had reached agreement as to the quantum of damages that Cincinnati owes the Condominium on the Condominium's contract claim. ECF No. 13.

II.  Legal Standards

The familiar standard for summary judgment is that it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." Frost v. N.Y.C. Police Dep't, 980 F.3d 231, 242 (2d Cir. 2020). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court must "construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Torcivia v. Suffolk Cnty., 17 F.4th 342, 354 (2d Cir. 2021).

In addition, "a court may grant summary judgment in favor of a non-moving party," even where that party has not filed a formal cross-motion for summary judgment, "if (1) no genuine issue of material fact is in dispute; (2) the non-moving party is entitled to judgment as a matter of law; and (3) the moving party has had an adequate opportunity to come forward with all of its evidence." N.Y. Marine & Gen. Ins. Co.

v. Travelers Prop. Cas. Co. of Am., 632 F. Supp. 3d 303, 304 n.1 (S.D.N.Y. 2022).

III. Analysis

Because the parties' papers indicated that this case involves only one dispute of material fact, the Court decided all the remaining issues raised by defendants' motion for summary judgment by determining which party was entitled to judgment as a matter of law.

A.    Cincinnati Financial Corporation

The Court begins with the prong of defendants' motion seeking the entry of judgment in favor of defendant Cincinnati Financial Corporation on all the Condominium's claims against it. Notably, the Condominium's opposition papers do not attempt to defend its claims against Cincinnati Financial Corporation. See generally ECF No. 10. The Court thus deems those claims abandoned. See Jackson v. Fed. Express, 766 F.3d 189, 196 (2d Cir. 2014). Even had the Condominium not abandoned its claims against Cincinnati Financial Corporation, however, there is no evidence before the Court that Cincinnati Financial Corporation is a party to the insurance policy between the Condominium and Cincinnati, and the Condominium has not alleged that Cincinnati Financial Corporation acted in bad faith. Accordingly, the Court granted summary judgment in favor of Cincinnati Financial Corporation on all the Condominium's claims.

B.    Implied Covenant of Good Faith and Fair Dealing

The Court next turns to Count Two, the Condominium's claim against Cincinnati for breach of the implied covenant of good faith and fair

7

dealing. The Condominium's opposition papers also fail to defend this claim, see generally ECF No. 10, and thus the Court deems it abandoned as well. Moreover, the Condominium's claim for breach of the implied covenant of good faith and fair dealing is based on the same facts as the Condominium's claim for breach of contract, and the implied covenant claim seeks the same relief as the contract claim. See ECF No. 9-2 at 11-12. Under these circumstances, well-established principles of New York law require that the Condominium's implied covenant claim be dismissed. See, e.g., Corretto LLC v. Erie Ins. Co., No. 24 Civ. 2674, 2025 WL 2676041, at *2-4 (S.D.N.Y. Sept. 18, 2025). Accordingly, the Court granted summary judgment to Cincinnati on the Condominium's claim for breach of the implied covenant.

C.    Breach of Contract

Having disposed of these matters, the Court turns to the Condominium's claim against Cincinnati for breach of contract (Count One) and the Condominium's associated request for declaratory relief (Count Three). As the parties agree, these claims reduce to a single question: "whether [the Condominium] has an insurable interest in the property for which it seeks coverage." ECF No. 10-3 at 3; ECF No. 11 at 1. Indeed, the insurance policy issued by Cincinnati expressly provides that "[w]e do not cover more than your insurable interest in any property." ECF No. 9-3 at 50. The Court therefore considers the extent of the Condominium's insurable interest and concludes that it extends to nearly all the repairs at issue, with the sole exception of the repairs to the Common Freight Elevator.

1.  Elements Other than the Common Freight Elevator

In New York, insurance coverage may be obtained with respect to property as to which an insured lacks a legal or beneficial interest, so long as the insured "is so situated as to be liable to loss if [the property] be destroyed by the peril insured against." Scarola v. Ins. Co. of N. Am., 31 N.Y.2d 411, 412-13 (1972). In Scarola, the Court of Appeals recognized the "general policy problem" that would arise if an insured could make a "wagering contract" despite having "no real economic interest" in the property at issue. Id. at 413. It held that the touchstone of the insurable-interest doctrine is whether an insured may "derive pecuniary benefit or advantage from [the] preservation" of insured property or, put differently, whether the insured risks suffering "pecuniary loss or damage from its destruction, termination, or injury by the happening of the event insured against." Id. "Great liberality is indulged in determining whether a person has anything at hazard in the subject matter of the insurance, and any interest which would be recognized by a court of law or equity is an insurable interest." Id. Hence, where competing arguments about the extent of insurable interest are both colorable, New York law generally favors insureds over insurers. Id.; cf. N.Y. Marine & Gen. Ins. Co., 632 F. Supp. 3d at 307 (holding that doubts about extent of coverage must be resolved in favor of the insured); Euchner-USA, Inc. v. Hartford Cas. Ins. Co., 754 F.3d 136, 141 (2d Cir. 2014) (similar).

Invoking Scarola, the Condominium primarily contends that it has an insurable interest in the property damaged by the flooding because

9

it is obligated, under the Declaration, to arrange for that property's repair. See ECF No. 10-3 at 3. Cincinnati's view is that, because the repairs for which it declined coverage occurred within individual units, the damage associated with those repairs was not within the Condominium's insurable interest. See ECF No. 9-2 at 5.

The Declaration and By-Laws indicate that the Condominium has the better of these arguments. Chiefly, Section 24.1(A) of the Declaration requires the Condominium to repair "damage to or destruction of the Building" caused by, among other things, "casualty." Declaration § 24.1(A). There is no dispute that the damage at issue resulted from a covered casualty -- as evidenced by the payments that Cincinnati undisputably did make -- and that the casualty required emergency repairs. See ECF No. 10-3 at 6.

Moreover, other provisions of the Declaration confirm that the Condominium, rather than unit owners, is obliged to make repairs in the event of such a casualty. See id. One such provision, Section 18.1(B), is an exception to the Declaration's general rule that unit owners are responsible for remediating damage to their respective units. Declaration § 18.1(B). Specifically, Section 18.1(B) expressly exempts from that general rule any "repair of damage due to fire or other casualty" because such repair "is the obligation of the Board of Managers pursuant to Article 24 of this Declaration." Id. If the Condominium were not responsible for remedying such damage -- and thus lacked an associated insurable interest -- Section 18.1(B) would be entirely superfluous.

10

Similarly, the Condominium's By-Laws obligate the Board to "cause repairs to be performed in a Unit in the event of an emergency (i.e., a situation involving continuing or imminent loss or threat of loss of life or property, personal injury[,] or material business interruption)." By-Laws, Art. III, § 6(a)(5). As the Condominium argues, the damage that the flooding caused to the Memorial Sloan Kettering unit, in which outpatient care for cancer patients is provided, is alone sufficient to have constituted an "emergency." See ECF No. 10 at 2, 5-6.[4]

Thus, based on the plain meaning of the Declaration and By-Laws, the Court concludes that the Condominium was obligated to make repairs and, accordingly, had an insurable interest. The Condominium's arguments are consistent with the New York Court of Appeals' policy of permitting a would-be insured to obtain coverage so long as it is at risk of any "pecuniary loss." See Scarola, 31 N.Y.2d at 413.

Cincinnati's arguments to the contrary are unavailing. It primarily contends that, because the Condominium does not face a prospect of economic loss from damage to unit interiors, the Condominium has an insurable interest only in the building's "General

---

[4] The Condominium argues, in the alternative, that other provisions of the Declaration require the Condominium to make certain specified repairs -- including to the building's electrical, HVAC, and fire alarm systems -- even outside the context of an emergency. See ECF No. 10-3 at 6-7 (quoting Declaration § 10). Although the Court need not reach these alternative arguments, it notes that there is no dispute that the flooding damaged the building's fire alarm system, bringing at least that component of the repairs within the scope of the Board's obligations. See ECF No. 10 ¶ 5.

11

Common Elements." See ECF No. 9-2 at 5-6. It further argues that the provisions of the Declaration concerning repairs in the event of casualty pertain only to the coordination of such repairs, not the assignment of financial responsibility for them. See ECF No. 11 at 3. The Declaration, according to Cincinnati, does not "transfer the economic risk of loss from unit owners to the [Condominium]." Id. But Cincinnati's suggestion that the Condominium could simply pass on to unit owners any costs that exceed any insurance proceeds that it receives, see id., fails to address which party should bear the economic loss if the Condominium makes emergency repairs but one or more unit owners do not pay their part of the costs. Under Scarola, because the Condominium may "suffer pecuniary loss or damage" if unit owners do not pay, it has an insurable interest with respect to the cost of emergency repairs. See 31 N.Y.2d at 412-413.

Moreover, Section 11.1 of the Declaration requires the Condominium to "obtain and maintain" various kinds of insurance coverage, including so-called "all risk" coverage. Declaration § 11.1. Cincinnati's reasoning risks rendering this provision nugatory because, if the Condominium cannot effectively insure against the cost of emergency repairs, the Declaration would obligate it to purchase coverage that it could never use. That result runs squarely counter to the Court of Appeals' direction that "great liberality [be] indulged" in determining a party has an insurable interest. See Scarola, 31 N.Y.2d at 412-13.

2.    The Common Freight Elevator

A different result obtains, however, with respect to the damage that the flooding caused to the Common Freight Elevator. This is because the Declaration expressly allocates financial responsibility for the Common Freight Elevator to the owner of the Hotel Unit. Declaration § 7.2 ("[T]he costs incurred by the [Condominium] in maintaining and repairing the [Elevator] shall be a Unit Expense of the Hotel Unit.") Although the Condominium contends that all the damage for which it submitted claims was caused by a casualty and constituted an emergency, thus entitling it to coverage, the Declaration expressly treats the Common Freight Elevator differently. Neither in its opposition papers nor at oral argument did the Condominium attempt to offer a contrary reading of Section 7.2.

For the foregoing reasons, on the Condominium's claims against Cincinnati for breach of contract and associated declaratory relief, the Court granted partial summary judgment to the Condominium on liability, except for unpaid claims arising from the maintenance and repair of the Common Freight Elevator.

3.    Damages

The sole remaining issue concerns the quantum of the Condominium's damages. As noted above, the Court's Order of May 12, 2026, concluded that neither party was entitled to summary judgment as to the damages that the Condominium sustained as a result of Cincinnati's breach of contract because the parties disagreed as to both (1) the total net payments that Cincinnati had issued and (2) the total outstanding

13

payments to which the Condominium has claimed that it is entitled. See ECF No. 12 at 2. Also as noted above, on June 2, 2026, the parties informed the Court that they had reached agreement that Cincinnati owes the Condominium $290,457.04. ECF No. 13. The parties calculated this amount by summing the invoices as to which the Condominium was entitled to payment and subtracting from that sum the policy deductible and Cincinnati's payments to date. See id. at 1-2. After independently verifying the parties' calculations, the Court concludes that the Condominium's damages on its contract claim are indeed $290,457.04.

IV.   Conclusion

For the foregoing reasons, the Court reconfirms its bottom-line Order of May 12, 2026, and holds that the Condominium has shown that it is entitled, as a matter of law, to monetary damages in the amount of $290,457.04 on its claim against Cincinnati for breach of contract and to declaratory relief consistent with this Opinion and Order.

The Clerk of Court is respectfully directed to enter final judgment and close this case.

SO ORDERED.

Dated:    New York, NY
          June 9, 2026                    _____
                                          JED S. RAKOFF, U.S.D.J.

14